Mr. Chief Justice Moore
dissenting:
Section 5, Article XVI, of the Colorado constitution provides that, “The water of every natural stream * * * [is] • subject to appropriation * * Section 6 of the same article states' that, “The right to divert the unappropriated waters of any natural stream to beneficial *344 uses shall never be denied,” and that, “Priority of appropriation shall give the better right * * *.”
In this action we are concerned with the Arkansas river which includes not only the waters visibly flowing on the surface of the river channel but also those waters found in the adjacent alluvial gravel fill through which they percolate and which are drawn by gravity in an easterly direction, moving at a relatively slow rate of speed, thus forming an underground supply of “transient storage” water. The visible water of the Arkansas river — that which is not located in the alluvium — flows on the top surface of the waters in transient storage in an open channel at a much higher velocity than that portion of the river which percolates through the alluvium. The visible and invisible portions of the river are so hydro-logically connected with each other that water removed from the alluvium is replaced by other water from the alluvium as well as by water from that part of the river which appears on the surface.
When there is an over-abundance of water percolating through the alluvium from the sides of the open channel, the level of such water in transient storage is raised so that when it reaches the level of the open channel it appears as surface water. Any diversions of water from the river, whether from the surface stream by dams or headgates or from the transient storage by means of wells, come from the same source of supply and diminish the total volume of water in the stream. Waters diverted either by diversion dam and ditch, or by well and ditch, when used in agriculture, return to the stream to the extent that they are not consumed by evaporation or plant transpiration.
We must remember that the Arkansas river is made up of water visible on the surface of the ground, together with that which moves along at a relatively slow pace through the underlying alluvium, emptying into the surface stream from the sides of the visible channel *345 at those places where the top level of alluvium water is higher than the surface channel. The alluvium draws water away from the surface channel at places where the “transient storage” level of alluvial water falls below the visible surface.
This court has had many occasions to determine the identity of waters which are part of a “natural stream” and which are subject to appropriation governed by the law of priority. We have repeatedly held that all waters, whether on the surface or underground that are tributary to a natural stream, are a part of the natural stream and subject to appropriation. Safranek v. Town of Limon, 123 Colo. 330, 228 P.2d 975, and other cases cited in that opinion.
In the majority opinion the conclusion is reached that the judgment must be reversed for the reason that the action of the state engineer in closing down the Fellhauer well amounted to “arbitrary and capricious” conduct. The only possible basis for this conclusion is the fact that prior to taking action the state engineer had not promulgated “rules and regulations” under the legislative act (C.RS. 1963, 148-11-22(1)) which requires the state engineer to administer the laws of the state relating to the distribution of
“* * * surface waters of the state including the underground waters tributary thereto in accordance with the right of priority of appropriation, and he shall adopt such rules and regulations and issue such orders as are necessary for the performance of the foregoing duties.”
The division engineer (Mr. Patterson) testified at some length concerning the facts justifying the order to close down the Fellhauer pumping operations. The trial court found nothing therein warranting the conclusion that “arbitrary • and capricious” conduct was involved in his efforts to discharge his duties under the law. I find nothing in the record which justifies the conclusion that an “arbitrary and capricious” exercise of authority conferred by statute is involved in this case.
*346 While it is true that the above quoted statute gives authority to issue “rules and regulations” and “orders” it is perfectly obvious that they are not limited to those directed to users of water, but may include those essential to the direction of employees of the state engineer in carrying out his complicated duties — the complexity of which is increased beyond foreseeable measure by the majority opinion in this case. It is also apparent that the statute is not a blanket mandate to issue rules, regulations, and orders, but only such as may be “necessary for the performance of the foregoing duties,” of administering the laws of the state relative to the distribution of surface and ground waters.
Mr. Patterson testified that well regulations were not made pursuant to any rules, regulations or guidelines published by the state engineer, but were regulated pursuant to the provisions of C.R.S. 1963, 148-12-5(1) which provides in pertinent part that:
“The duties of the irrigation division engineer shall be as follows: He shall be governed by all laws relative to irrigation division engineers and shall have general control over the water commissioners of the several districts within his division. Under the general supervision of the state engineer, he shall execute the laws of the state relative to the distribution of water, in accordance with the right of priority of appropriation as established by judicial decrees. In the distribution of water, he shall be governed by the regulations of this chapter, and laws that are now in force, but for the better discharge of his duties, he shall have the authority to make such other regulations to secure the equal and fair distribution of water, in accordance with the rights of priority of appropriation, as, in his judgment, may be needed in his division. * * *”
His testimony was to the effect that under C.R.S. 1983, 148-12-6, he is supplied with a copy of the decrees adjudicated in his water district by the district court, which decrees are sufficient to provide adequate guide *347 lines since all material factual matters are contained therein. He stated, “We regulate wells the same as we do the ditches of the Valley.” Well regulation is based on the effect on senior appropriators, and if some diversions are so far removed from the stream or so situated that such regulation will produce no water to the stream system, they are not regulated. Regulation of decreed wells depends upon whether the regulation thereof will provide water. He further testified that wells were closed down on the basis of whether the effect would be material to the stream’s system as a whole rather than for the benefit of a particular appropriator because the division engineer operates the stream as a system and not for the benefit of any one individual. In short, his statement was to the effect that above and beyond the direction of the statute and the court decrees, there was no need for the exercise of the statutory authority “to make such other regulations to secure the equal and fair distribution of water, in accordance with the rights of priority of appropriation, as, in his judgment, may be needed in his division.” (Emphasis added.)
It appears that the division engineer encountered a public relations problem in dealing with appropriators of water from wells who took the position that their rights were being violated; that the engineer had no authority to regulate them; and that the law requiring their regulation was unconstitutional. He called a series of meetings in an effort to make explanation and to work out a plan. This conscientious effort to find an acceptable solution to a pressing problem can hardly be called - “arbitrary and capricious” action. A program based upon cessation of well operations during the time between specific dates was discussed but no acceptable solution was reached by those participating in the meetings. Thereafter, Mr. Patterson began administration of the Jaw according to adjudicated priorities “based upon the demands of the senior appropriators and their senior *348 rightsAdmittedly he may have taken into consideration conclusions reached in these discussions, as he undertook to discharge his duties in the protection of the vested constitutional rights of senior appropriators of water. He testified as follows:
“A. The wells being nonadjudicated we could not recognize as having a particular differentiation between wells. Our state law provides that a water right granted in a subsequent adjudication is junior to all water rights granted in preceding adjudications irrespective of the date of first use, and a water right that has not been adjudicated must automatically be inferior to all water rights that have been adjudicated.”
The substance of the above quoted statement has at all times heretofore been generally accepted as a correct statement of the law.
In this case the question arises as to whether the 1965 act in effect confers upon the engineer the authority to adjudicate priorities as between wells which theretofore had not sought decrees in adjudication proceedings conducted exclusively in the district court. The only language which conceivably might be construed as delegating this power to the engineer is that contained in C.R.S. 1963, 148-11-22(1) in which he is directed to regulate the distribution of water “* * * in accordance with the right of priority of appropriation. * * *” Under existing law as provided by C.R.S. 1963, 148-9-2, jurisdiction to adjudicate “Priority of appropriation of water between owners and claimants of water rights * * * is vested exclusively in the district court.”
The majority opinion, notwithstanding numerous opinions of this court which frown upon such action, repeals this last mentioned statute by implication, and the only basis for so doing is the language in the 1965 statute that, “The state engineer * * * shall execute and administer the laws of the state relative to the distribution of the waters of the state including the underground waters tributary thereto in accordance with the *349 right of priority of appropriation * (Emphasis added.)
Under all the law pertinent to the doctrine of “priority of appropriation,” an unadjudicated right is inferior to an adjudicated right, and neither the state engineer or division engineer could make a rule or regulation, or make a finding, the effect of which would be to overturn priorities duly established by court decree. Decreed priorities represent vested property rights which cannot be diminished in value without compensation to the owner. I am firm in my conviction that the state engineer is without authority to determine priorities of unadjudicated water rights, whether diverted by wells or otherwise so long as the exclusive power to determine priorities is vested in the district court by statute. Because he failed to enter this area of attempting to fix priorities as between unadjudicated wells (all of which were junior to all adjudicated rights) and because he did not issue “rules and regulations” concerning the order in which unadjudicated wells would be shut down, it is said that the division engineer acted “arbitrarily and capriciously.” I cannot subscribe to such doctrine, and protest against such an announcement.
I am unable to find substantial basis for any conclusion that the state engineer “arbitrarily or capriciously” shut down the well of Fellhauer. In doing so he was following procedures used in the distribution of waters of the Arkansas river for one hundred years. He did not shut down any appropriator of water until investigation disclosed that by so doing additional water would be made available to senior appropriators. Admittedly he did not try to fix priorities among unadjudicated wells because jurisdiction to do so is “vested exclusively in the district court.” (C.R.S. 1963, 148-9-2.) Admittedly Fellhauer’s well had no adjudicated priority; admittedly any right claimed by him could never antedate the year 1935; admittedly numerous adjudicated rights with priorities as early as 1887 were without sufficient water *350 to fulfill their decreed rights; admittedly his well caused material injury to senior appropriators.
I am unable to understand how it can be said that the engineer acted “arbitrarily and capriciously” when all that he did was that which his predecessors in office had been doing for one hundred years. He shut down a diversion of water by a junior appropriator in order that senior and prior rights might be protected, as it was his duty to do under command of the constitution, statutes, and court decrees fixing priority rights. The constitution, statutes, and court decrees have heretofore supplied all the “rules and regulations” which have been deemed necessary in the water district here involved for about one hundred years to protect the vested interests of claimants to the use of water in that district.
As I see it, rights guaranteed by the constitution to senior appropriators of water which have heretofore been fortified and protected by statute and court decisions are being violated by the majority opinion announced this date. These rights, being overlooked or misapprehended, are the constitutional rights of senior appropriators to require the division engineer to stop illegal diversions of water which destroy the value of their vested, adjudicated, prior rights.
Whether in later adjudication proceedings the district court would be justified in fixing priority dates retroactively, or nunc pro tunc, under authority of the legislative act which purports to direct that:
“* * * The priority date of a ground water appropriation shall not be postponed to a time later than its true date of initiation by reason of failure to adjudicate such right in any such adjudication proceeding,”
C.R.S. 1963, 148-2-11, is a matter which raises serious questions involving vested rights. Determination of those questions are not essential to decision in the instant case. Ip this connection it is sufficient to direct attention to the constitutional provision which provides (Art. II, Sec. 11):
*351 “No * * * law * * * retrospective in its operation * * * shall be passed by the general assembly.”
I view with deep concern the general trend of the opinion of the majority which, as I perceive it, will tend to create many uncertainties in areas where certainty and stability are most essential to full enjoyment of vested rights of long duration. I am also deeply conscious of the fact that by the judgment of my brethren — whose earnestness, dedication, and sincerity I do not question — my dissenting views are without merit. Nevertheless I have been required by conscience to set them forth for the single reason that although, admittedly, I may be wrong, I am not in doubt.